1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

TROY COOPER,

11

Plaintiff,                         No. CIV S-10-1057 GEB DAD P

12

vs.

13

KAUR et al.,

14

Defendants.          FINDINGS AND RECOMMENDATIONS

15

_____/

16

Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17

relief under 42 U.S.C. § 1983.  This matter is before the court on a motion for summary

18

judgment brought on behalf of defendants Chen and Kaur pursuant to Rule 56 of the Federal

19

Rules of Civil Procedure.  Plaintiff has filed an opposition to the motion, and defendants have

20

filed a reply.

21

**BACKGROUND**

22

Plaintiff is proceeding on an amended complaint against defendants Dr. Chen,

23

Nurse Kaur, and Pharmacist Naku.[1]  In relevant part, plaintiff alleges in his complaint as follows.

24

From August 2005 through April 2008, plaintiff underwent three separate surgical procedures for

25

---

26

[1] Defendant Naku has not joined in the pending motion for summary judgment.

peripheral vascular disease at Queen of the Valley Hospital ("QVH").  In October 2008, several months after his third surgery, plaintiff was housed at CSP-Solano and began experiencing pain in his lower right leg.  Plaintiff told defendant Nurse Kaur of his condition, and she examined him "for one minute at most" and diagnosed him with tendinitis.  According to plaintiff, defendant Nurse Kaur did not review plaintiff's recent and extensive medical history.  On the same day, plaintiff saw defendant Dr. Chen and complained that he was having the same type of pain that he suffered when he had a blood clot.  Defendant Dr. Chen refused to examine plaintiff and also told him that he had tendinitis.  Defendant Dr. Chen told plaintiff to "do some stretches" and ordered a cream for his leg.  Plaintiff informed defendant Dr. Chen that he was having trouble walking and had to wait for his circulation in his leg to "get right," but defendant Dr. Chen did not seem to care and allowed plaintiff to suffer pain in his lower right leg for the next 10 to 12 days.  (Am. Compl. at 3-9.)

On November 5, 2008, plaintiff had a follow-up appointment at QVH.  His doctor determined that plaintiff had another blood clot, so plaintiff underwent a fourth surgical procedure on that very day.  After the operation, plaintiff returned to CSP-Solano where defendant Dr. Chen still insisted that plaintiff had tendinitis.  Plaintiff informed defendant Dr. Chen that he had a blood clot.  Plaintiff did not experience further difficulties with his leg until December 8, 2008, when he began to experience the same pain.  On December 24, 2008, plaintiff saw defendant Dr. Chen and complained about that pain.  Defendant Dr. Chen again told plaintiff that he had tendinitis.  For the next five days or so, plaintiff experienced pain in his right leg when he attempted to walk more than 150 yards at a time.  Finally, on December 29, 2008, plaintiff saw Dr. Rohrer at the prison's medical annex.  Dr. Rohrer noticed that plaintiff's right foot was cold and called for an ambulance to transport him to QVH.  Once plaintiff arrived at QVH, doctors unsuccessfully tried to remove another blood clot from his leg.  Ultimately, plaintiff was required to undergo an amputation of his leg below the right knee.  (Am. Compl. at 9-12.)

1    Plaintiff claims that the defendants have been deliberately indifferent to his

2 serious medical needs.  In terms of relief, plaintiff requests damages.  (Am. Compl. at 13-15.)

3                    **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

4    Summary judgment is appropriate when it is demonstrated that there exists "no

5 genuine issue as to any material fact and that the moving party is entitled to a judgment as a

6 matter of law."  Fed. R. Civ. P. 56(c).

7                    Under summary judgment practice, the moving party
                always bears the initial responsibility of informing the district court
8                of the basis for its motion, and identifying those portions of "the
                pleadings, depositions, answers to interrogatories, and admissions
9                on file, together with the affidavits, if any," which it believes
                demonstrate the absence of a genuine issue of material fact.

10

11 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

12 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

13 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

14 to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

15 after adequate time for discovery and upon motion, against a party who fails to make a showing

16 sufficient to establish the existence of an element essential to that party's case, and on which that

17 party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

18 concerning an essential element of the nonmoving party's case necessarily renders all other facts

19 immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

20 whatever is before the district court demonstrates that the standard for entry of summary

21 judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

22    If the moving party meets its initial responsibility, the burden then shifts to the

23 opposing party to establish that a genuine issue as to any material fact actually does exist.  See

24 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

25 establish the existence of this factual dispute, the opposing party may not rely upon the

26 allegations or denials of its pleadings but is required to tender evidence of specific facts in the

1  form of affidavits, and/or admissible discovery material, in support of its contention that the

2  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

3  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

4  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

5  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

6  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

7  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

8  1436 (9th Cir. 1987).

9       In the endeavor to establish the existence of a factual dispute, the opposing party

10 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

11 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

12 versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

13 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

14 genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

15 committee's note on 1963 amendments).

16      In resolving the summary judgment motion, the court examines the pleadings,

17 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

18 any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

19 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

20 court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

21 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

22 produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

23 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

24 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

25 show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

26 /////

4

1  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

2  'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

3                    **OTHER APPLICABLE LEGAL STANDARDS**

4  I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

5           The Civil Rights Act under which this action was filed provides as follows:

6           Every person who, under color of [state law] . . . subjects, or causes
           to be subjected, any citizen of the United States . . . to the
7           deprivation of any rights, privileges, or immunities secured by the
           Constitution . . . shall be liable to the party injured in an action at
8           law, suit in equity, or other proper proceeding for redress.

9  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

10  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

11  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

12  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

13  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

14  omits to perform an act which he is legally required to do that causes the deprivation of which

15  complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

16           Moreover, supervisory personnel are generally not liable under § 1983 for the

17  actions of their employees under a theory of respondeat superior and, therefore, when a named

18  defendant holds a supervisorial position, the causal link between him and the claimed

19  constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

20  (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

21  allegations concerning the involvement of official personnel in civil rights violations are not

22  sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

23  II.  The Eighth Amendment and Inadequate Medical Care

24           The unnecessary and wanton infliction of pain constitutes cruel and unusual

25  punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

26  Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities."  Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference.  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

1   Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

2   105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

3   negligence in diagnosing or treating a medical condition, without more, does not violate a

4   prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

5   indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

6   ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835

7   (quoting Whitley, 475 U.S. at 319).

8          Delays in providing medical care may manifest deliberate indifference.  Estelle,

9   429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

10  providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

11  1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

12  1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

13  Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

14  prisoner need not show his harm was substantial; however, such would provide additional

15  support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

16  v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

17         Finally, mere differences of opinion between a prisoner and prison medical staff

18  or between medical professionals as to the proper course of treatment for a medical condition do

19  not give rise to a § 1983 claim.  Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330,

20  332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662

21  F.2d 1337, 1344 (9th Cir. 1981).

22              **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

23  I.  Defendants' Statement of Undisputed Facts and Evidence

24         Defendants' statement of undisputed facts is supported by citations to declarations

25  signed under penalty of perjury by defendants Nurse Kaur and Dr. Chen and citations to

26  /////

1   plaintiff's medical records.  It is also supported by reference to excerpts from plaintiff's

2   deposition.

3          The evidence submitted by defendants Nurse Kaur and Dr. Chen establishes the

4   following.  In 2005, plaintiff was diagnosed as suffering from peripheral vascular disease

5   ("PVD").  PVD is a progressive narrowing or blocking of the arteries which results in restricted

6   blood flow to the leg or limb.  PVD can cause coldness, bluish discoloration, pain when walking

7   (called "claudication"), or gangrene in the extremities.  (Defs.' SUDF 2-3, Pl's Dep., Esquivel

8   Decl. Ex. C, Chen Decl.)

9          Between August 2005 and April 2008, plaintiff underwent three surgical

10  procedures to treat his PVD.  In April 2008, plaintiff also received a prescription for Coumadin, a

11  blood thinner, to treat his PVD.  On October 6, 2008, plaintiff went to the walk-in clinic at CSP-

12  Solano because of pain in his lower right leg.  Defendant Nurse Kaur examined him and checked

13  his pain level, ability to walk, pedal (foot) pulses, and the appearance of his legs and calves.

14  Defendant Nurse Kaur also tested plaintiff for Homan's signs (an ankle-flex test to check for

15  possible blood clots), and they were negative.  Defendant Nurse Kaur observed that plaintiff's

16  pedal pulse in his right foot was weaker than his left foot and scheduled him for an immediate

17  doctor's appointment.  (Defs.' SUDF 4-8, Pl.'s Dep., Esquivel Decl. Ex. C, Kaur Decl. & Ex. B.)

18         On that same day, plaintiff saw defendant Dr. Chen.  Plaintiff complained of pain

19  in his lower right leg when he stood up or walked.  Defendant Dr. Chen reviewed plaintiff's

20  medical file and performed a physical examination.  Plaintiff did not have swelling, coldness, or

21  discoloration of his right leg, but plaintiff's right Achilles tendon was tender.  Defendant Dr.

22  Chen reviewed the results of plaintiff's last blood work (PT measures blood clotting, and INR

23  tests the effectiveness of blood thinners) which had been ordered to treat and monitor his PVD.

24  Defendant Dr. Chen diagnosed plaintiff with Achilles tendinitis, prescribed him capsaicin cream,

25  a topical pain reliever, and advised him to rest his ankle.  Defendant Dr. Chen did not diagnose

26  /////

1   plaintiff as suffering from a blood clot at that time because plaintiff did not have any symptoms

2   indicative of a circulatory problem.  (Defs.' SUDF 9-14, Pl.'s Dep., Chen Decl. & Ex. A.)

3           After plaintiff's visit with defendant Dr. Chen, defendant Nurse Kaur scheduled

4   plaintiff for his next appointment, instructed him to take his Coumadin as prescribed, and told

5   plaintiff to return to the clinic if he developed any swelling or redness or if his leg pain

6   continued.  Defendant Nurse Kaur also called the prison pharmacy to ensure that plaintiff

7   received his Coumadin prescription.  (Defs.' SUDF 15-16, Kaur Decl. & Ex. B.)

8           On October 8, 2008, plaintiff returned to the walk-in clinic and complained of leg

9   pain and tightness in his right lower calf.  He told defendant Nurse Kaur that the pain went away

10  when he sat down.  Defendant Nurse Kaur examined plaintiff, noted that he could walk with his

11  cane without difficulty, and observed that plaintiff's right leg was not swollen or cold.  Plaintiff

12  was also negative for Homan's signs, had an even pedal pulse, and both of his calves were equal

13  in size.  However, defendant Nurse Kaur found that plaintiff's Achilles tendon was hard to the

14  touch.  Defendant Nurse Kaur instructed plaintiff to wear soft shoes, use the capsaicin cream

15  defendant Dr. Chen prescribed, and return to the clinic if his symptoms worsened.  (Defs.' SUDF

16  17-18, Kaur Decl. & Ex. B.)

17          On October 10, 2008, plaintiff returned to the clinic for an appointment to review

18  the results of his recent blood work.  Defendant Dr. Chen had already reviewed the test results

19  with plaintiff on October 6, 2008, so defendant Nurse Kaur scheduled plaintiff for his next blood

20  work.  While they were scheduling plaintiff's lab appointment, plaintiff told defendant Nurse

21  Kaur that he had not yet received the prescribed capsaicin cream.  Defendant Nurse Kaur called

22  the pharmacy to inquire about the prescription and learned that it would be available later that

23  day.  She told plaintiff to return to the clinic if he developed any swelling, redness, or coldness in

24  his legs.  (Defs.' SUDF 19-20, Kaur Decl. & Ex. B.)

25          On October 22, 2008, plaintiff saw defendant Dr. Chen for a scheduled follow-up

26  appointment.  Plaintiff complained of pain in the ball of his right foot, tightness in his right calf,

1   and a burning sensation when he walked farther than 150 yards.  Defendant Dr. Chen examined

2   plaintiff and saw that his right leg exhibited normal coloration and had no edema, swelling, or

3   tenderness.  Defendant Dr. Chen confirmed with plaintiff that he had a follow-up appointment

4   with a vascular surgeon the following week.  Defendant Dr. Chen prescribed plaintiff a gel insole

5   arch support for the leg pain and ordered an additional INR test to monitor the effectiveness of

6   plaintiff's blood thinner prescription.  Immediately following plaintiff's appointment with

7   defendant Dr. Chen, defendant Nurse Kaur placed the order for the arch support and scheduled

8   plaintiff for the blood work defendant had Dr. Chen prescribed.  Defendant Nurse Kaur did not

9   treat or triage plaintiff on that day nor did she see or treat plaintiff again after this instance.

10  (Defs.' SUDF 21-24, Pl.'s Dep., Chen Decl. & Ex. A, Kaur Decl. & Ex. B.)

11          On November 5, 2008, plaintiff saw a vascular surgeon at QVH who noted that

12  plaintiff's prior surgical procedures to correct or improve his circulation in his right leg had

13  failed.  Plaintiff underwent right-leg surgery again because the right femoral artery was blocked

14  and multiple segments of the artery were at the early stages of developing blockages.  Despite the

15  surgeon's attempts, plaintiff's circulation was diminutive and his artery could not be cleared or

16  unblocked any further at that time.  (Defs.' SUDF 25, Esquivel Decl. & Ex. C.)

17          On November 25, 2008, plaintiff saw defendant Dr. Chen for a scheduled

18  appointment.  Plaintiff complained of right shoulder pain and claimed he could walk 500 yards

19  without pain.  Defendant Dr. Chen examined plaintiff's extremities and did not see any swelling

20  or edema.  He had no signs of calf tenderness.  Defendant Dr. Chen ordered several prescriptions

21  to address plaintiff's shoulder pain and did not see plaintiff again until December 24, 2008.  At

22  that scheduled appointment, plaintiff complained of pain in his right shoulder and denied any leg

23  pain or claudication.  Defendant Dr. Chen examined plaintiff, including his extremities, and did

24  not see any evidence of edema, swelling, calf tenderness, or leg pain.  Defendant Dr. Chen

25  treated plaintiff's shoulder pain and ordered another routine INR test.  Defendant Dr. Chen did

26  /////

1  not see or treat plaintiff again after this appointment.  (Defs.' SUDF 26-29, Pl.'s Dep., Chen

2  Decl. & Ex. A.)

3          On December 28, 2008, plaintiff went to the medical clinic with complaints of

4  pain in his right leg after walking.  He had no swelling or redness but was scheduled for an

5  appointment with a doctor for the next day.  He saw a doctor the following day, and the doctor

6  sent him to QVH for further evaluation because his right foot was cold.  On December 31, 2008,

7  surgeons at QVH operated on plaintiff's right leg and noted that the artery to his right leg was

8  diseased and had multiple lesions.  The surgeons could not remove all of the clotting.  On

9  January 7, 2009, surgeons at QVH amputated plaintiff's right leg below the knee after failed

10  attempts to restore circulation to his foot.  (Defs.' SUDF 30-33, Esquivel Decl. & Ex. C.)

11          According to defendants, plaintiff acknowledged during his deposition that he has

12  no evidence that defendants' acts or omissions resulted in the amputation of his leg, that the

13  amputation was avoidable, or that the leg pain he experienced before the amputation was as a

14  result of blood clots.  Defendants declare that they did not ignore plaintiff's complaints and did

15  not delay in providing him with medical care for the conditions and symptoms he presented with

16  on the occasions that they saw him.  (Defs.' SUDF 34-35, Pl.'s Dep., Chen Decl., Kaur Decl.)

17  II.  Defendants' Arguments

18          Defense counsel argues that the defendants are entitled to summary judgment in

19  their favor with respect to plaintiff's Eighth Amendment claim because there is no evidence

20  before the court indicating that they were deliberately indifferent to plaintiff's medical needs.

21  Specifically, defense counsel argues as follows as to the evidence with respect to defendant

22  Nurse Kaur.  In October 2008, Nurse Kaur saw plaintiff on four occasions.  She treated and

23  triaged his ailments, referred him to a doctor as needed, scheduled his follow-up appointments,

24  placed orders for prescriptions, and checked on the status of his prescriptions.  Defense counsel

25  argues that the evidence with respect to defendant Dr. Chen reflects as follows.  From October

26  2008 through December 2008, defendant Dr. Chen also saw plaintiff on four occasions.

1    Defendant Dr. Chen performed physical exams of plaintiff, conducted visual inspections of his

2    body and limbs, scheduled lab tests for him, and prescribed medication and medical apparatuses

3    for plaintiff.  Defendant Dr. Chen also monitored plaintiff's PVD and anti-clotting medication by

4    ordering regular testing.  Defense counsel contends that based upon this evidence, both

5    defendants Nurse Kaur and Dr. Chen properly responded to plaintiff's complaints and symptoms

6    and did not ignore his need for medical treatment.  (Defs.' Mem. of P. & A. at 7-8.)

7            Defense counsel also argues that there is no evidence before the court that

8    defendants' conduct caused plaintiff harm.  Although plaintiff alleges that defendants' failure to

9    diagnose him with a blood clot resulted in the amputation of his right leg, he has no evidence to

10   support this clam.  Rather, according to defendants, the undisputed evidence shows that plaintiff

11   underwent three surgical procedures to treat his PVD before April 2008, and was taking

12   medication to thin his blood to help his circulation.  The evidence also shows that, after October

13   2008, plaintiff underwent at least two more surgeries to unblock his right femoral artery.  Despite

14   repeated surgeries and ongoing treatment, proper circulation could not be restored to plaintiff's

15   right leg.  (Defs.' Mem. of P. & A. at 9-10.)

16           Finally, defense counsel argues that in light of the evidence presented in

17   connection with the pending motion the defendants are entitled to qualified immunity.  In

18   counsel's view, the defendants did not violate plaintiff's rights under the Eighth Amendment.

19   Moreover, counsel contends that even if defendants violated plaintiff's constitutional rights by

20   failing to diagnose a blockage in his right leg, they reasonably believed that they were providing

21   him with adequate medical care by treating his symptoms and attempting to relieve his leg pain

22   when they saw him.  (Defs.' Mem. of P. & A. at 11-12.)

23   III.  Plaintiff's Opposition

24           In opposition to defendants' motion for summary judgment, plaintiff

25   contends that defendants Nurse Kaur and Dr. Chen were aware of his medical condition and that

26   he experienced pain in his right leg, but they diagnosed him as suffering only with tendinitis and

1   ordered him gel insoles and told him to do stretches.  Plaintiff declares that he subsequently went

2   to QVH where his doctor diagnosed him with acute onset claudication.  (Pl.'s Decl. at 5-6.)

3          Thereafter, plaintiff contends that he saw defendant Dr. Chen and told the

4   defendant that he was experiencing leg pain after walking again, but defendant Dr. Chen failed to

5   conduct an examination and nonetheless indicated "no claudication" in plaintiff's medical

6   records.  According to plaintiff, just five days after that inadequate care rendered by defendant

7   Dr. Chen, plaintiff saw Dr. Rohrer who called an ambulance for plaintiff because his right foot

8   was cold.  Plaintiff was admitted to QVH again, but doctors were unable to restore circulation to

9   his right leg and had to amputate it below the knee.  (Pl.'s Decl. at 6.)

10  IV.  Defendants' Reply

11         In reply, defense counsel argues that plaintiff has failed to raise a factual dispute

12  regarding defendants' treatment of his serious medical needs.  If anything, defense counsel

13  contends that plaintiff's evidence shows that the defendants addressed his medical complaints

14  each time they saw him.  In counsel's view, plaintiff has not submitted any evidence indicating

15  that defendant's medical treatment was so inadequate that it amounted to no treatment at all.

16  Moreover, counsel notes, plaintiff's disagreement with the course of treatment employed by

17  defendants does not amount to a constitutional violation.  Finally, defense counsel contends that

18  plaintiff has failed to submit evidence that the defendants' acts or omissions led to the

19  amputation of his leg.  (Defs.' Reply at 1-2.)

**ANALYSIS**

21  I.  Plaintiff's Serious Medical Needs

22         The parties do not dispute and the undersigned concludes that based upon the

23  evidence presented by the parties in connection with the pending motion a reasonable juror could

24  (and in fact would) conclude that plaintiff's PVD constitutes an objective, serious medical need.

25  See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or

26  patient would find important and worthy of comment or treatment; the presence of a medical

1    condition that significantly affects an individual's daily activities; or the existence of chronic and

2    substantial pain are examples of indications that a prisoner has a 'serious' need for medical

3    treatment."); Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth

4    Amendment duty to provide medical care applies "to medical conditions that may result in pain

5    and suffering which serve no legitimate penological purpose.").

6           Specifically, plaintiff's largely undisputed medical history and the observations

7    and treatment recommendations by the defendants themselves as well as other prison doctors and

8    the doctors at QVH, compel the conclusion that plaintiff's medical condition, if left untreated,

9    could result in "further significant injury" and the "unnecessary and wanton infliction of pain."

10   McGuckin, 974 F.2d at 1059.  Accordingly, resolution of the motion for summary judgment

11   brought on behalf of defendants Nurse Kaur and Dr. Chen hinges on whether, based upon the

12   evidence before the court on summary judgment, a rationale jury could conclude that the

13   defendants responded to plaintiff's serious medical needs with deliberate indifference.  See

14   Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

15   II.  Defendants' Response to Plaintiff's Serious Medical Needs

16          The court finds that defendants Nurse Kaur and Dr. Chen have borne the initial

17   responsibility of demonstrating that there is no genuine issue of material fact with respect to the

18   adequacy of the medical care provided to plaintiff.  As to defendant Nurse Kaur, defendants'

19   evidence demonstrates that when Nurse Kaur first visited with plaintiff on October 6, 2008, she

20   examined him and checked his pain level, ability to walk, pedal (foot) pulses, and the appearance

21   of his legs and calves.  Defendant Nurse Kaur also tested him for Homans' signs.  When Nurse

22   Kaur observed that plaintiff's pedal pulse in his right foot was weaker than his left foot, she

23   scheduled him for an immediate doctor's appointment.  On October 8, 2008, Nurse Kaur saw

24   plaintiff again for complaints of leg pain and tightness in his right-lower calf.  She examined him

25   and observed that he was able to walk with his cane without difficulty, and his right leg was

26   neither swollen nor cold to the touch.  Plaintiff was negative for Homans' signs, had an even

14

pedal pulse in both feet, and his calves were of equal size.  Defendant Nurse Kaur observed that plaintiff's right tendon was hard to the touch and instructed him to wear soft shoes, use the capsaicin cream defendant Dr. Chen has previously prescribed, and return to the clinic if his symptoms worsened.  On October 10, 2008, plaintiff returned to the clinic for an appointment to review his lab results.  Because defendant Dr. Chen already reviewed the test results with him on October 6, 2008, Nurse Kaur scheduled plaintiff for his next blood work.  While scheduling the lab appointment, plaintiff told her that he had not yet received the capsaicin cream defendant Dr. Chen had previously prescribed, so she called the pharmacy and learned it would be available later that day and instructed plaintiff to return to the clinic if he developed swelling, redness, or coldness in his legs.  Finally, on October 22, 2008, Nurse Kaur placed an order for an arch support for plaintiff and scheduled him for blood work that defendant Dr. Chen had ordered.  She did not treat plaintiff on that day.  According to defendant Nurse Kaur, she never ignored plaintiff's complaints of leg pain and never delayed providing him treatment or referral for the conditions and symptoms he presented with on the occasions that she saw him.  (Kaur Decl. & Ex. B.)

As to defendant Dr. Chen, defendants' evidence demonstrates that he treated plaintiff on October 6, 2008, for complaints of pain in his right Achilles tendon.  Per his customary practice, defendant Dr. Chen reviewed plaintiff's medical file and examined plaintiff. Specifically, Dr. Chen listened to plaintiff's lungs and heart, checked his pulse, blood pressure, respiration, and temperature, and examined his abdomen and extremities.  He found that plaintiff had tenderness in his Achilles tendon but had no swelling, coldness, or discoloration.  Dr. Chen did not diagnose plaintiff with a blood clot or other circulatory condition attributable to his PVD because plaintiff's leg was not discolored or cold, and he did not have any symptom indicative of a circulatory problem at that time.  Defendant Dr. Chen saw plaintiff again on October 22, 2008, for complaints of pain on the ball of his right foot when he walked more than 150 yards.  Per his customary practice, defendant Dr. Chen again reviewed his medical file and examined plaintiff in

the same manner described above.  Plaintiff had tenderness in his right foot and Achilles tendon but did not have swelling of the calf, edema (fluid beneath the skin), discoloration, or signs of acute vascular occlusion (arterial blockage).  Defendant Dr. Chen prescribed plaintiff an arch support for his heel and confirmed that plaintiff had a follow-up appointment with a vascular surgeon in a week.  Defendant Dr. Chen also ordered plaintiff additional INR testing to monitor the effectiveness of his blood-thinner prescription.  On November 25, 2008, Dr. Chen saw plaintiff again during a scheduled follow-up appointment.  Per his customary practice, he reviewed plaintiff's medical records and examined him.  Plaintiff had no swelling, edema, or calf tenderness of his legs.  Plaintiff complained of right shoulder pain, and defendant Dr. Chen issued several prescriptions to address this complaint of pain.  Finally, on December 24, 2008, defendant Dr. Chen saw plaintiff during a scheduled follow-up appointment.  He reviewed plaintiff's medical records and examined him.  Plaintiff complained of pain in his right shoulder and denied any leg pain or claudication.  Defendant Dr. Chen found no edema, swelling, calf tenderness, or pain in his legs.  Defendant Dr. Chen ordered another routine INR test.  According to defendant Dr. Chen, he never ignored plaintiff's complaints of leg pain and never delayed providing him treatment or referral for the conditions and symptoms he presented with on the occasions that he saw him.  Based on his experience, training, and education, defendant Dr. Chen declares that he treated plaintiff appropriately.  (Chen Decl. & Ex. A.)

Given the evidence submitted by defendants Nurse Kaur and Dr. Chen in support of the pending motion for summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of material fact with respect to his inadequate medical care claims.  On defendants' motion for summary judgment, the court is required to believe plaintiff's evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor.  The court has reviewed plaintiff's verified complaint, his opposition to defendants' motion, and his deposition testimony.  Drawing all reasonable inferences in plaintiff's favor, the court concludes that plaintiff has submitted sufficient evidence in this action to create a genuine issue

1   of material fact with respect to his claim that the defendants responded to his serious medical

2   needs with deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

3           Defense counsel argues that the undisputed evidence shows that defendants did

4   not disregard plaintiff's serious medical needs and that they responded to his complaints as well

5   as his symptoms.  However, the mere fact that defendants provided plaintiff with some form of

6   medical treatment does not necessarily absolve them of all liability for their actions.  See Lopez

7   v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) ("A prisoner need not prove that he was

8   completely denied medical care.") (en banc); Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th

9   Cir. 1989).

10          In Ortiz, police found Ortiz asleep in a canal bank and arrested in him on an

11   outstanding warrant.  At the City of Imperial Jail, he fell and struck his head and was taken to the

12   hospital where he received sutures but no x-rays.  The doctor at the hospital diagnosed the cause

13   of Ortiz's fall as alcohol withdrawal and released him to police custody two hours later.  The

14   doctor provided the sheriff with a Patient After Care Sheet that explained that problems from

15   injuries can occur sometime later and to report to the doctor or emergency room immediately if

16   Ortiz experienced increased drowsiness or a persistent headache.  After Ortiz returned to his cell

17   at the jail, he fell again and was placed in the jail infirmary.  Two days after the initial fall Ortiz

18   was found unconscious, and he died ten days later in the hospital due to blunt force trauma to the

19   head and skull fractures sustained at the time of his initial fall.  Ortiz's survivors brought a civil

20   rights action against his nurses and physicians at the jail alleging deliberate indifference to his

21   serious medical needs.  See Ortiz, 884 F.2d at 1313.

22          In the Ortiz case the parties did not dispute that Ortiz received medical care in the

23   days following his fall.  Nor did they dispute that the defendants were aware of Ortiz's head

24   injury.  However, the parties did dispute the adequacy of the medical care provided to Ortiz.

25   Specifically, when Ortiz began to exhibit some of the symptoms identified on the Patient After

26   Care Sheet, the defendants did not call the emergency room or the doctor from the hospital and

instead called a different doctor who prescribed Ortiz sedatives without examination. Sedatives are an appropriate remedy for alcohol withdrawal symptoms but are not appropriate for head injuries because they can mask symptoms of the injuries. At summary judgment, the district court determined that the defendants' conduct could not constitute deliberate indifference to Ortiz' medical needs and that they could not be found liable for his death. See Ortiz, 884 F.2d at 1313.

Reversing the district court in part, the Ninth Circuit held that Ortiz's survivors were not required to demonstrate the defendants complete failure to treat Ortiz to survive summary judgment. The court reiterated that "access to medical staff is meaningless unless that staff is competent and can render competent care." Ortiz, 884 F.2d at 1314 (quoting Cabrales v. County of Los Angeles, 864 F. 2d 1454, 1461 (9th Cir. 1988). The court explained that the defendants knew of Ortiz's head injury but disregarded evidence of complications that the doctor at the hospital had alerted them to previously. 884 F.2d at 1314. As a matter of law, the Ninth Circuit concluded that it could not say that certain nurses and doctors were not deliberately indifferent to Ortiz's serious medical needs. Id.

As in Ortiz, the parties here do not dispute that the defendants provided plaintiff with some form of medical care from October 2008 through December 2008. Nor do the parties dispute that the defendants were aware of plaintiff's serious medical need, i.e. his PVD. Defendants Nurse Kaur and Dr. Chen themselves declare that they treated plaintiff in light of his medical history and condition. According to plaintiff's version of events supported by his own declaration and sworn testimony, which this court is required to believe in considering defendants' motion for summary judgment, he complained to the defendants directly and in his health care request forms that he was experiencing pain in his right leg consistent with PVD and a blood clot. Notwithstanding plaintiff's extensive medical history with PVD, as well as his complaints, plaintiff maintains that the defendants failed to review his medical records, conducted either cursory or no examinations of his right leg, and blindly diagnosed him as

1  suffering only from tendinitis and improperly treated him for that condition on multiple

2  occasions.  (Am. Compl. at 8-9 & Pl.'s Dep. at 12 & 19-20, 29-32, 42-44, 50, 57.)

3        Within less than a month of his initial medical visits with the defendants, plaintiff

4  had a follow-up appointment at QVH where his doctor there determined that he was suffering

5  from another blood clot and needed a fourth PVD-related surgical procedure on the very day of

6  his arrival there.  Even after that fourth surgical procedure, plaintiff returned to CSP-Solano

7  where he saw defendant Dr. Chen on two more occasions.  According to plaintiff, defendant Dr.

8  Chen continued to insist that plaintiff merely had tendinitis even though plaintiff informed the

9  doctor that he previously experienced a blood clot in that area and was experiencing similar pain

10  once more.  Finally, on December 29, 2008, plaintiff saw Dr. Rohrer at the prison's medical

11  annex, and Dr. Rohrer noticed that plaintiff's right foot was cold and called for an ambulance to

12  transport plaintiff to QVH.  There, doctors were unsuccessful in attempting to remove another

13  blood clot from plaintiff's leg and were required to amputate his leg below the right knee.  (Am.

14  Compl. at 9-12.)

15        Here, the medical treatment provided to plaintiff by defendants Nurse Kaur and

16  Dr. Chen raises genuine issues of material fact as to whether their acts or omissions were

17  "sufficiently harmful to evidence deliberate indifference" to plaintiff's serious medical needs.

18  Estelle, 429 U.S. at 106.  See also Wood, 900 F.2d at 1234 ("poor medical treatment will at a

19  certain point rise to the level of a constitutional violation").  To be sure, a mere difference of

20  opinion between plaintiff and defendants Nurse Kaur and Dr. Chen as to the proper course of

21  medical care would not give rise to a cognizable § 1983 claim.  Jackson, 90 F.3d at 332;

22  Sanchez, 891 F.2d at 242; Franklin, 662 F.2d at 1344.  Moreover, mere negligence and medical

23  malpractice by defendants Nurse Kaur and Dr. Chen certainly would not be sufficient to support

24  a cause of action for deliberate indifference.  Broughton v. Cutter Laboratories, 622 F.2d 458,

25  460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  However, under at least one version of

26  events in this case, the defendants repeatedly disregarded plaintiff's complaints of PVD-related

19

medical complications (i.e., pain in his right leg after walking certain distances) and totally failed to treat him competently.  Although plaintiff may not have exhibited swelling, edema, discoloration, or signs consistent with what defendants believed to be indicative of a blood clot, plaintiff's primary complaint of pain in his right leg was entirely consistent with what he had experienced previously just before needing PVD-related surgical procedures on his right leg.  As plaintiff testified to under penalty of perjury, he has always experienced pain after walking certain distances and not any other symptoms such as swelling, discoloration, pins and needles, and other physical symptoms.  (Pl.'s Dep. at 23-24).

"A finding that the defendant repeatedly failed to treat an inmate properly or that a single failure was egregious strongly suggests that the defendant's actions were motivated by 'deliberate indifference' to the prisoner's medical needs."  McGuckin, 974 F.2d at 1062.  See also Wood, 900 F.2d at 1334 ("In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect.").  Based on the evidence submitted on summary judgment, this court cannot say as a matter of law that defendants Nurse Kaur and Dr. Chen were not deliberately indifferent to plaintiff's serious medical needs.  There are disputed issues of material fact with respect to the medical care provided to plaintiff and the circumstances presented at the time of that care which preclude the granting of summary judgment and are issues that only the finder of fact can resolve.

Accordingly, defendants' motion for summary judgment based on defendants' medical treatment of plaintiff should be denied.

III.  Actual or "But For" Causation

The court now turns to defense counsel's argument that plaintiff has failed to present any evidence that his right leg could have been saved but for the defendants' acts or omissions.  In this regard, defense counsel contends as follows.  Plaintiff had already undergone three surgical procedures to treat his PVD prior to April 2008.  In addition, after October 2008,

1   plaintiff underwent at least two more surgical procedures.  Despite the repeated surgeries, doctors

2   could not restore circulation to his right leg.  In so arguing, defense counsel appears to suggest

3   that plaintiff's right leg amputation in December was inevitable.  While defense counsel may

4   prevail on this argument when presenting it to a jury, this court cannot say as a matter of law that

5   defendants' conduct was not the actual cause of plaintiff's amputation.

6         The decision in Conn v. City of Reno, 591 F.3d 1081 (9th Cir. 2010), vacated on

7   other grounds by 131 S. Ct. 1812 (2011) is instructive on this point.  In Conn, two police officers

8   were transporting an intoxicated Brenda Clustka to civil protective custody when they witnessed

9   her wrap a seatbelt around her neck in an apparent attempt to choke herself.  Clustka screamed

10  that the officers should kill her, or she would kill herself.  The officers did not take her to the

11  hospital, and upon arriving at the jail they did not report the choking incident to jail personnel.  A

12  few hours after a brief intake procedure, Clustka was released.  The following day, officers

13  detained Clustka once more on a different charge and returned her to the jail.  During this second

14  detention she hanged herself in her cell.  Clustka's family members sued jail and city officials.

15  At summary judgment, the district court determined, inter alia, that there was insufficient

16  evidence to raise a genuine issue of material fact as to whether the two officers' failure to report

17  Clustka's choking incident and suicide threat caused Clustka's death.  See Conn, 591 F.3d at

18  1090-94.

19        Reversing the district court, the Ninth Circuit held that there was sufficient

20  evidence on the issue of causation such that a jury could find in the Clustka family members'

21  favor.  Id. at 1098-1100.  Specifically, the family members had argued that if officers had

22  responded to Clustka's choking incident and suicide threat and reported it, they could have

23  prevented her suicide less than 48 hours later.  For example, the officers could have responded to

24  the incident and threat of suicide by taking Clustka to the hospital and reporting the incident to

25  hospital staff or by continuing on to the jail and reporting the incident to jail personnel.  In the

26  latter case scenario, jail personnel would have rejected her and sent or to the hospital or admitted

her and placed her under suicide watch.  The defendants in the case countered that the family

members were merely speculating as to those outcomes.  For example, the defendants noted that

on two previous occasions hospital personnel evaluated and released Clustka from the emergency

room without transferring her to a psychiatric facility.  Similarly, on three prior other occasions

when Clustka was transferred to a psychiatric facility, she did not stay longer than a day.  In

defendants' view, because Clustka had not harmed herself while in the officers' custody, there

was reason to believe that she was no longer suicidal.  In this regard, the defendants argued that

even if medical personnel had evaluated Clustka at a hospital or at the jail with knowledge of the

choking incident and suicide threat, they may have nevertheless released her without further

intervention.  Finally, defendants argued that, even assuming the officers had passed on the

information of the choking incident to jail personnel, Clustka was released that day and the

information would not have been transmitted to jail intake personnel when she was detained the

following day.  As such, according to the defendants, Clustka would not have been put on suicide

watch or treated any differently.  See Conn, 591 F.3d at 1099.

Rejecting defendants' argument, the Ninth Circuit explained:

> The defendants' argument rests on the questionable assumption
> that knowledge of Clustka's second suicide threat in two days, if
> reported upon her arrival at the jail or at a hospital, would not have
> raised an alarm for medical personnel such that Clustka would
> have received more precautionary treatment than she otherwise did.
> It presupposes, moreover, that any such treatment would have been
> ineffective and that, regardless, the subsequent events would have
> occurred when they did.  It makes little sense, however, to argue
> that the failure to provide access to suicide prevention services has
> no causal effect on a suicide that transpires less than 48 hours later.
> If suicide intervention is expected to have no impact on whether
> someone attempts suicide, why would the City ever bother with the
> Legal 2000 procedure?  Suicide prevention services are designed to
> assess the patient and release her only after a determination that she
> is no longer at risk.  In Clustka's case, this determination was never
> made by someone who had all the requisite information about her
> psychological instability at the time.  A jury could reasonably find
> that the defendants' failure to report critical information rendered
> the subsequent medical evaluations ineffectual.  Clustka's suicide
> might well have been prevented by effective medical intervention -
> such as holding her on a Legal 2000 or for up to 72 hours - but that

1         intervention would likely have occurred only if the crucial
      information about the choking incident and suicide threat were
2         known by the persons making the necessary determinations.
      (emphasis in original)
3

4   Conn, 591 F.3d at 1098-1100.  See also Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1189

5   (9th Cir. 2002) ("[T]here is evidence in the record to support the inference that if the medical

6   staff had evaluated Gibson, prevented him from entering the jail, and directed him to a mental

7   hospital, Gibson almost certainly would have received the care he needed, rather than face

8   conditions that worsened his outlook.").

9           Similarly, the defendants' causation argument here rests on a questionable

10  assumption and presupposes too much.  Specifically, defense counsel assumes that even if

11  defendants Nurse Kaur and Dr. Chen treated plaintiff for PVD instead of tendinitis from October

12  2008 through December 2008, plaintiff still would not have received medical intervention in time

13  to avoid his amputation.  Defense counsel also presupposes that any intervening PVD-related

14  treatment by defendants or outside specialists would have been ineffective and that the

15  amputation of plaintiff's leg would have occurred when it did in any event.  However, the

16  evidence in this case, when construed in the light most favorable to plaintiff as is required on

17  defendants' motion for summary judgment, supports the inference that had defendants Nurse

18  Kaur and Dr. Chen treated plaintiff for PVD instead of tendinitis, plaintiff might well have

19  received the medical care he needed to avoid amputation of his leg.  As defense counsel

20  observes, plaintiff had successfully undergone multiple PVD-related surgical procedures that

21  helped him avoid having his leg amputated at those previous points in time.  Moreover, if such

22  intervening medical treatment for plaintiff's PVD was not going to have any effect on plaintiff's

23  leg, why did plaintiff's doctors at QVH repeatedly continue trying to save his leg through

24  multiple surgical procedures?  Based on the evidence before the court on summary judgment, a

25  jury could reasonably find that plaintiff's leg amputation was not inevitable, may have been

26  prevented if there was effective medical intervention on his behalf, and that the medical

1   intervention would have occurred had defendants Nurse Kaur and Dr. Chen been treating him for

2   PVD-related complications instead of tendinitis.  Where, as here, the adequacy of the medical

3   care provided to plaintiff remains in dispute, the court cannot say as a matter of law that

4   defendants alleged conduct was not the actual or "but for" cause of plaintiff's injury.  That issue

5   also depends upon the resolution of disputed issues of fact by the finder of fact.

6            Accordingly, defendants' motion for summary judgment should be denied in this

7   regard as well.

8   IV.  Qualified Immunity

9            The court now turns to defense counsel's contention that defendants Nurse Kaur

10  and Dr. Chen are entitled to qualified immunity.  "Government officials enjoy qualified

11  immunity from civil damages unless their conduct violates 'clearly established statutory or

12  constitutional rights of which a reasonable person would have known.'"  Jeffers v. Gomez, 267

13  F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a

14  court is presented with a qualified immunity defense, the central questions for the court are (1)

15  whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

16  defendant's conduct violated a statutory or constitutional right and (2) whether the right at issue

17  was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001).

18           Although the court was once required to answer these questions in order, the

19  United States Supreme Court has clarified that "while the sequence set forth there is often

20  appropriate, it should no longer be regarded as mandatory."  Pearson v. Callahan, 555 U.S. 223,

21  236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a

22  statutory or constitutional violation, "there is no necessity for further inquiries concerning

23  qualified immunity."  Saucier, 533 U.S. at 201.  Likewise, if a court determines that the right at

24  issue was not clearly established at the time of the defendant's alleged misconduct, the court may

25  end further inquiries concerning qualified immunity without determining whether the allegations

26  in fact make out a statutory or constitutional violation.  Pearson, 555 U.S. at 236-42.

As discussed above, drawing all reasonable inferences from the evidence submitted in plaintiff's favor as the court must on defendants' motion for summary judgment, a reasonable jury could conclude that defendants Nurse Kaur and Dr. Chen were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment.  Moreover, by 2008, "the general law regarding the medical treatment of prisoners was clearly established," and "it was also clearly established that [prison staff] could not intentionally deny or delay access to medical care."  Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002).  Any reasonable prison official should have known that repeatedly failing to properly treat plaintiff's serious medical needs violated the Eighth Amendment.

Accordingly, defendants' motion for summary judgment based on the affirmative defense of qualified immunity should also be denied.

## OTHER MATTERS

In the pending motion for summary judgment, defense counsel also argues that plaintiff's Fourteenth Amendment due process claim is duplicative of his Eighth Amendment deliberate indifference claim and that any deliberate indifference claim is properly maintained under the Eighth Amendment.  (Defs.' Mem. of P. & A. at 10.)

Defense counsel is correct that plaintiff's due process claim is duplicative of his deliberate indifference claim.  Counsel is also correct that plaintiff's deliberate indifference claim is properly brought under the Eighth Amendment and not the Fourteenth Amendment.  Estelle, 429 U.S. at 104 ("deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.").  Accordingly, insofar as plaintiff was attempting to state a separate Fourteenth Amendment claim, the court will recommend that the claim be dismissed.

/////

/////

/////

**CONCLUSION**

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (Doc. No. 36) be granted in part and denied in part as follows:

      a. Defendants' motion for summary judgment on plaintiff's Eighth Amendment claim be denied;

      b. Defendants' motion for summary judgment based on the affirmative defense of qualified immunity be denied;

      c. Defendants' motion for summary judgment on plaintiff's Fourteenth Amendment due process claim be granted; and

2. Plaintiff's Fourteenth Amendment due process claim be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 31, 2012.

Dale A. Drozd
_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
coop1057.57

26